## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NICHOLAS BRYSON,

    Plaintiff,

    v.

WARDEN SHANE WEBER,

    Defendant.

Civil Action No.: JKB-24-1726

---

### MEMORANDUM OPINION

Plaintiff Nicholas Bryson, an inmate incarcerated in Western Correctional Institution ("WCI") in Cumberland, Maryland, filed this civil rights complaint against Warden Shane Weber alleging a violation of his rights under the Eighth Amendment of the United States Constitution. (ECF No. 1.) In response, Defendant Warden Shane Weber filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 11.) Bryson opposes the motion. (ECF No. 13.) The matters pending before the Court have been fully briefed; there is no need for a hearing. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, Defendant's Motion, construed as a Motion to Dismiss, will be granted.

### I.    Background

Bryson is serving a life sentence for a sex offense. (ECF No. 1 at 3.) He states that his "entire incarceration is said to be very life threatening, every moment of everyday" due to the nature of his offense. (*Id.*) On March 1, 2024, when he first arrived at WCI, he told intake staff that he feared for his safety, but he was reassured that his charges would not cause an issue and that there was "no need to worry." (*Id.*) According to Bryson, his need for protective custody was ignored. (*Id.*)

Bryson was initially assigned to Housing Unit ("HU") 3, A tier, and his Case Manager Mr. Davis told him that his only options regarding housing were either administrative segregation or staying in general population and "keep[ing] [his] head down and [his] mouth shut." (ECF No. 1 at 3.) Mr. Davis further advised Bryson that if he went on administrative segregation, he would not be allowed to attend church, library, school, other activities, or to have a job assignment. (*Id.*) This caused Bryson concern because he has no other source of income and requires "special soap and baby powder" which he must buy himself from commissary. (*Id.*) Mr. Davis further advised Bryson that it "will be ugly when they (inmates) find out" what Bryson did. (*Id.*) After talking to Mr. Davis, Bryson decided to stay in general population. (*Id.* at 4.)

On or about April 9 and 10, 2024, Bryson alleges, his cellmate found out about Bryson's charges and attempted to kill him. (ECF No. 1 at 4.) Bryson states he "again" told "staff that I feared for my life" and requested protective custody ("PC"). (*Id.*) Although Harford County Detention Center where Bryson was held in pre-trial detention had a tier where "sex offenders can be safely housed," Bryson discovered that WCI does not have an equivalent type of housing. (*Id.*) When Bryson told staff he feared for his life, he was told that it amounted to him "refusing to 'lock-in.'" (*Id.*) Despite the fact that another inmate allegedly tried to kill Bryson, he was taken to disciplinary segregation on HU 4, B tier. (*Id.*) He states he was "not given [his] ticket until May 9th" his hearing date. (*Id.*) At the hearing, Bryson was told that HU 5, C tier is used as a Special Housing Unit, but in order to be assigned to that unit, Bryson would have to accept the ticket. (*Id.*) Bryson did as he was told and on May 11, 2024, he was assigned to HU 5, D tier, Cell 7. (*Id.*)

Bryson states that his cellmate in HU 5 was a confirmed member of the MS-13 gang and the first day Bryson was in the cell, his cellmate "ran his name" and found out why he was in

2

prison. (ECF No. 1 at 4.) Upon discovering that Bryson is a sex offender, his cellmate gave him 24 hours to leave. (*Id.*) Bryson states that he tried to resolve the situation through proper channels by sending inmate requests expressing a concern for his safety, but when his twenty-four hours were up, his cellmate informed him he would be stabbed. (*Id.*) Bryson explains that he and his cellmate fought for three to four days with no relief from staff. (*Id.*) Bryson reported to the "bubble," which he describes as the center point on each housing unit, and spoke to Officer Goebel. (ECF No. 1 at 4.) Bryson explained that he feared for his life and told the officer why; the response was to move Bryson's cellmate. (*Id.*) Bryson surmises that this may have caused issues with the MS-13 gang. (*Id.*)

The day after Bryson spoke to Officer Goebel, Lt. Merling summoned Bryson to his office and told him that if he needed assistance, he would only need to contact him. (*Id.*) Lt. Merling also told Bryson that he would not be moved to PC and sent him back to his cell. (*Id.*) A few days after Bryson spoke to Lt. Merling, two members of the Dead Men Incorporated ("DMI") gang stole his state-issued tablet and tried to extort Bryson with the threat of spreading the word about his charges. (ECF No. 1 at 5.) On May 20, 2024, Bryson sought Lt. Merling's assistance both verbally and in writing, but he was ignored. (*Id.*) The following day when Bryson had not met the DMI gang members' demands, they began telling other inmates about the nature of Bryson's charges. (*Id.*) Bryson went to Officer Goebel to report that his life was being threatened by the DMI and that he feared for his life. (*Id.*) When Bryson arrived at HU 4, Officer Lark told him he could not be housed on B tier because members of DMI were being housed there. (ECF No. 1 at 5.) Instead, he was assigned to a cell on C tier. (*Id.*)

On May 21, 2024, Bryson was told by a correctional officer that he needed to file an administrative remedy procedure complaint ("ARP") regarding his request for PC and his stolen

tablet but when he asked for a form, he was told there were none available. (*Id.*) Bryson's efforts to write informal complaints seeking a remedy and directed to Lt. Forney, ARP Coordinator Sgt. Briana Hart, Chief of Security Jason Harbaugh, and Case Managers Mr. Nines and Mr. Jefcoat rendered no response. (*Id.*)

On June 1, 2024, Officer Smith moved Bryson from HU 4, C tier to B tier where members of DMI were housed. (ECF No. 1 at 6.) When Bryson tried to reason with Officer Smith, Bryson was simply dismissed and told that Smith "didn't care, not his problem; and take it up with the Housing Unit #4 Manager, Lt. Forney." (*Id.*)

On June 4, 2024, Bryson was removed from lock-up and sent to HU 2, D-tier. (ECF No. 1 at 6.) Shortly after he arrived, he was summoned over the intercom to report for an attorney visit. (*Id.*) Bryson's new cellmate asked about his charges, but Bryson did not answer. (*Id.*) After waiting for 20 minutes for the video visit to connect, Bryson was told the attorney visit had been cancelled by an unidentified officer at WCI. (*Id.*)

When Bryson returned to his cell, his cellmate told him that "a bunch of DMI were just there looking to crack [his] skull because there is an active hit out on [him]." (ECF No. 1 at 6.) Bryson went to the bubble and told Officer P. Lark that he feared for his life and why. (*Id.*) Bryson claims that Officer Lark told him he could not allow him back onto the tier, but he issued him a notice of inmate rule violation that states he told him to return to his cell. (*Id.*)

Bryson was then returned to HU 4 lock-up where Officer L. Lark, Officer P. Lark's brother, was working and who told Bryson that the DMI gang is everywhere. (ECF No. 1 at 7.) Bryson states he found out that the DMI leader, "Munchie" was housed in HU 2, D tier. (*Id.*) He was told he should not consider it a coincidence that he was put on a tier that was full of DMI members while having an active hit on his head. (*Id.*)

4

Bryson states that his former cellmate on HU 4 informed him that "WCI did in fact try to kill [him]." (ECF No. 1 at 7.) He explains that "WCI has placed Mr. Barnes and I in situation because of his standing in the Muslim community, which somehow found out about the nature of my charges, which put great-grave pressure on him to remedy the situation (me) by 'inmate rules.'" (*Id.*) On June 6, 2024, Mr. Barnes was promised he would be allowed to move, and Officer Smith told Bryson there was someone special already lined up to be housed with him. (*Id.*) Bryson states that he has not received a response from his written complaints, nor has a staff member sought to resolve his stolen property issue or his diet request. (*Id.*)

Bryson claims that WCI knowingly put him somewhere in an attempt to weaponize inmates against him while ignoring his requests for PC. (ECF No. 1 at 7–8.) He asserts he remains in fear for his safety and life; he has been denied access to the administrative remedy procedure process, access to the phones, and access to employment. (*Id.*) He additionally complains that he is unable to correspond with his wife, Heather Clark, who is also incarcerated in a Maryland Division of Correction facility. (*Id.* at 8.) He adds that he refuses to commit acts of violence for self-defense because he believes it will be taken out of context to charge him with another crime. (*Id.*) As relief Bryson seeks "safe and fair treatment," to be housed properly, to be given an equal opportunity for employment, state pay, education and religious services, and monetary damages of $15,000. (*Id.* at 9.)

## II.    Standard of Review

In reviewing the complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v.*

5

*Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.   Discussion

### A.   Personal Participation

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Beyond his position as Warden of WCI, Bryson has not alleged any basis for his claim against Warden Weber. As noted, his status as a supervisor alone does not make him liable for the conduct of the employees at WCI. Bryson does not sufficiently allege any actual or constructive knowledge on Weber's part. Further, Bryson does not sufficiently allege a "pervasive and unreasonable risk." *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) ("Establishing a

'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury."). Accordingly, the Complaint must be dismissed.

### B.    Failure to Protect – Eighth Amendment

Had Bryson named an appropriate Defendant, his claim would still fail on the merits. "The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). Instead:

> First, a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. For a claim based on a failure to prevent harm, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm . . . . Second, the prison official must have a sufficiently culpable state of mind to be held liable. In prison-conditions cases[,] that state of mind is one of deliberate indifference to inmate health or safety.

*Id.*

Bryson fails to sufficiently allege an Eighth Amendment violation. The allegations of the complaint reflect that, when Bryson informed a correctional officer that his life was being threatened, he was removed from the situation (albeit not in the manner he preferred) and placed in a different cell. Further, the religious preference or the charges for which his cellmates are convicted are insufficient to establish that they present a danger to him. (*See* ECF No. 13 at 1 and 2 (referencing Muslim cellmate and cellmate who is a murderer).)

8

### C.    Property Claim

To the extent that Bryson raises a claim about his property being stolen, this claim fails to state a federal constitutional claim.  In the context of prison litigation, where it is alleged that property is lost or stolen, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy.  *See Parratt v. Taylor*, 451 U.S. 527, 540 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy.  *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[1]  The Supreme Court has extended its *Parratt* holding to intentional deprivations of property.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Assuming Bryson's personal property was stolen, such a claim does not rise to a constitutional violation.[2]  The claim must therefore be dismissed under the provisions of 28 U.S.C. § 1915(e). *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *see also Denton v. Hernandez*, 504 U.S. 25, 32 (1992); *Cochran v. Morris*, 73 F.3d 1310, 1315 (4th Cir. 1996); *Nasim v. Warden*, 64 F.3d 951, 954-55 (4th Cir. 1995).

### D.    Telephone Calls

Bryson's assertions regarding his difficulties in getting approval to call his wife who is incarcerated at MCIW is now moot because his request to do so has now been approved by both wardens.  His additional stated concerns about the ability to see his wife via video connection so

---

[1]    Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property, given *Juncker's* reliance on *Parratt* in dismissing the due process claim.

[2]    In rejecting a prisoner's Fourth Amendment claim to an expectation of privacy in his cell, the Supreme Court stated that denying such a claim did not "mean that [a prisoner] is without a remedy for calculated harassment unrelated to prison needs. Nor does it mean that prison attendants can ride roughshod over inmates' property rights with impunity. The Eighth Amendment always stands as a protection against 'cruel and unusual punishments.' By the same token, there are adequate state tort and common-law remedies available to respondent to redress the alleged destruction of his personal property." *Hudson,* 486 U.S. at 530–31.

that he can visualize her well-being does not appear to be a cognizable claim. It will be dismissed without prejudice.

## IV.    Conclusion

Defendant Warden Shane Weber's Motion to Dismiss shall be granted by separate Order which follows.

Dated this 24 day of June , 2025.

FOR THE COURT:

James K. Bredar
United States District Judge

10